COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judge Lemons and
          Senior Judge Duff
Argued at Alexandria, Virginia


REZNICK DEVOLE CURRIE
                                      OPINION BY
v.     Record No. 0477-98-4    CHIEF JUDGE JOHANNA L. FITZPATRICK
                                      JUNE 15, 1999
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                     Alfred D. Swersky, Judge

          Jeffrey T. Barbour (J. Amy Dillard, Deputy
          Public Defender; Office of the Public
          Defender, on brief), for appellant.

          Leah A. Darron, Assistant Attorney General
          (Mark L. Earley, Attorney General, on
          brief), for appellee.


     Reznick Currie (appellant) was convicted in a jury trial of

burglary, attempted rape, and assault and battery.  On appeal,

he contends the trial court erred in:  (1) excluding five

proffered categories of testimony by an eyewitness

identification expert; (2) denying him access to exculpatory

evidence; (3) excluding proffered pages of the complaining

witness' sworn preliminary hearing transcript; and (4) denying

his motion to strike the evidence because the Commonwealth

failed to establish that he was the perpetrator of the alleged

crimes.  For the following reasons, we affirm.

I.  BACKGROUND

Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, the prevailing party below, granting to it all reasonable inferences fairly deducible therefrom.  See Juares v. Commonwealth, 26 Va. App. 154, 156, 493 S.E.2d 677, 678 (1997).  So viewed, the evidence established that on August 4, 1997, the victim was in the bathroom of her ground-floor apartment when she heard a noise in the living room.  As she exited the bathroom, she saw a stranger standing in her living room with his pants down and his penis exposed.  The man, whom the victim later identified as appellant, grabbed her breast and she kicked him.  The man produced a knife, grabbed the front of the victim's pants and began to pull them down.  The victim pushed the man, ran to her bedroom and telephoned for help.

The victim testified that her assailant was close enough to grab her and that he was face-to-face with her.  When the police arrived, she described the man's physical appearance, including his having a missing upper tooth and various marks on his arms and a rash on his neck.  He wore a long-sleeve shirt and gloves.[1]

_____

[1] Detective Irv Ellman testified that on the evening of the offense, the victim described her assailant through an interpreter as a thirty to thirty-five-year-old black male; five-feet, ten-inches to five-feet, eleven-inches tall; 170 to 190 pounds, with an athletic or muscular build.  She described him as having a noticeable defect in his chin and that he was missing a tooth in his upper mouth.  He had thick lips, a wide nose and smelled of alcohol.  His hair was short and he had dark

-

Based upon her description, Detective Robert Hickman produced a composite sketch of the attacker.

A few days after the offense, the victim reviewed a photographic lineup and identified a photograph of appellant as her assailant.  She stated, "I knew that it was him, that one." The victim also identified shoes and pants that appeared similar to those worn by her attacker.  At trial, the victim again identified appellant as being her assailant.

Appellant argued at trial that the victim was wrong in her identification and that he was not the perpetrator of the crime. The jury found appellant guilty of the offenses charged.

## II.  EYEWITNESS IDENTIFICATION EXPERT

In his defense, appellant called Dr. Solomon Fulero, an expert on eyewitness identification, who testified generally on the theory of memory and on the issue of cross-racial identification.  Pursuant to a pretrial ruling, Dr. Fulero was not allowed to testify on the following five topics relating to eyewitness identification:  (1) the correlation between eyewitness certainty and accuracy; (2) the effect of viewing time and stress on eyewitness accuracy; (3) the perpetrator's display of a weapon and its effect on eyewitness accuracy; (4) the effect that participating in preparing a composite sketch of a subject has on the accuracy of subsequent identifications; and

---

marks, bumps or scars on his skin.  She described his face as thin.

-

(5) the concept of transference.  Concluding that these topics were within the lay knowledge of the average juror and could be adequately argued to the jury in closing arguments, the trial court ruled as follows:

> The proffered testimony of Defendant's
> expert regarding the theory of memory in the
> field of psychology (acquisition, retention
> and retrieval) as set forth in paragraph 2
> of Defendant's memorandum, and the problems
> in cross-racial identifications as set forth
> in paragraph 5 of Defendant's memorandum,
> will be admitted subject to the reliability
> hearing, if any.  These are matters the
> Court finds are not within the common
> knowledge and experience of the average
> juror and, hence, could be the subject of
> expert testimony.
>
>      *      *      *      *      *      *      *
>
> The remaining areas of expert testimony the
> Court finds are within the common experience
> and knowledge of the average juror and the
> proffered testimony will not be allowed.
> Further, Defendant's expert will not be
> allowed to testify as to the specific
> identification in this case as to its
> reliability nor as to its validity.  Such
> testimony would usurp the function of the
> jury to determine the credibility of
> witnesses.

(Emphasis added).

On appeal, appellant contends that Dr. Fulero's proffered testimony in the five excluded categories was "vital to [the] jury's understanding of whether the identification made [was] correct."  He argues that his expert should have been allowed to explain to the jury the psychological and scientific principles underlying the identification process.  We disagree.

-

Where the admissibility of expert testimony is challenged on appeal, the standard of review is whether the trial court abused its discretion.  See Archie v. Commonwealth, 14 Va. App. 684, 694, 420 S.E.2d 718, 723 (1992).  "Expert testimony is appropriate to assist triers of fact in those areas where a person of normal intelligence and experience cannot make a competent decision."  Utz v. Commonwealth, 28 Va. App. 411, 423, 505 S.E.2d 380, 386 (1998).  "The expert testimony must be relevant, and the trial judge must determine whether the subject matter of the testimony is beyond a lay person's common knowledge and whether it will assist the trier of fact in understanding the evidence or in determining a fact in issue." Id.

In Rodriquez v. Commonwealth, 20 Va. App. 122, 455 S.E.2d 724 (1995), we addressed the issue of the admissibility of expert testimony on the subject of eyewitness identification. We noted as a preliminary matter that "[t]he refusal to admit expert testimony on the subject of eyewitness testimony is a matter within the [sound] discretion of the trial court."  Id. at 127, 455 S.E.2d at 727.

> In excluding expert commentary on eyewitness identifications, courts have consistently found that this type of testimony interferes with the jury's role as fact finder and its duty to weigh the credibility of witnesses.  [T]he trustworthiness of eyewitness observations is not generally beyond the common knowledge and experience of the average juror and is,

-

> therefore, not a proper subject for expert testimony. In addition, [t]he weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury. Another concern is that this type of testimony frequently has the potential of turning trials into battles between experts over the value of eyewitness identifications.

Id. (citations and internal quotations omitted). However, we recognized that in some "narrow" circumstances, expert testimony may be useful to the jury, including in the following areas: "such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference." Id. (citations omitted).

Nevertheless, we held that the decision whether to allow expert testimony concerning an eyewitness identification is a decision left to the sound discretion of the trial court. See id. at 128, 455 S.E.2d at 727. "By asking an expert to render an opinion about the propriety of lineup procedures and the reliability of eyewitness identifications, a defendant in effect asks the expert to comment upon the credibility of the identifying witness, an issue clearly within the jury's province." Id.

In the instant case, the trial judge permitted Dr. Fulero to testify about the mechanical processes of memory and cross-racial identification because these subjects were not within the common knowledge and experience of the jurors.

-

However, the trial judge specifically found that the additional five categories of testimony proffered by appellant were within the common knowledge and experience of the jurors.

We find no error in the trial court's limiting testimony concerning the correlation between eyewitness certainty and accuracy. As we noted in Rodriguez, "the uncertain relationship between eyewitness confidence and accuracy" was not the type of "narrow" circumstances requiring expert testimony. Id. at 129, 455 S.E.2d at 728. Similarly, the trial court properly excluded the proffered expert testimony about the unreliability of subsequent identifications and the effect of short viewing time, stress, and the display of a weapon. See id. (holding that "the unreliability of a subsequent identification" and "the prevalence of misidentification in situations involving stress, poor lighting, or delay" are topics "within the lay knowledge of the jurors").

Additionally, appellant's counsel addressed in argument to the jury the issues limited by the trial court, such as the reliability of the victim's identification given the short period of time of the assault, the fear and stress involved in the situation and the effect of the attacker's display of a weapon. Counsel also challenged the reliability of the victim's identification based upon the theory of transference.[2] Counsel

_____

[2] According to Dr. Fulero's proffered testimony, the doctrine of transference occurs "when a witness picks a person from a

-

stated, "Did she pick out a familiar face that she had seen in McCrory's that weekend?  You heard testimony that she was in McCrory's as was [appellant].  Or was she just plain wrong?"

The jury was capable of evaluating whether the victim's identifications of appellant were reliable or whether the identifications were incorrect based on the suggested problems associated with memory.  For these reasons, we hold that the trial court did not abuse its discretion in excluding the proffered expert testimony.

### III.  EXCULPATORY EVIDENCE

At the commencement of trial, appellant sought disclosure of a composite drawing of a purported suspect in a series of sexual assaults in Northern Virginia and Maryland.  These assaults occurred when appellant was in prison for an unrelated conviction, and he asserted that this person might be responsible for the instant crimes.  The Commonwealth denied that similarities existed between those cases and the instant case.  The composite drawing was placed in an envelope under seal and submitted to the trial judge for an in camera review. The trial court later refused to disclose the drawing to

---

line-up or photo spread based on the fact that they have seen the person previously, not because the person is the suspect at the scene of the crime."  We recognized in Rodriguez that the theory of transference might be a topic appropriate for expert testimony.  See Rodriguez, 20 Va. App. at 128, 455 S.E.2d at 727.  In the instant case, the trial judge allowed appellant's counsel to argue this issue to the jury.

-

appellant, stating: "I have personally examined the composite photo submitted by the Commonwealth this morning and likewise rule that it is not exculpatory in this case."[3]

Appellant also sought undisclosed pages from the police reports of Detectives Quinones and Ellman. The Commonwealth's Attorney indicated that he had given to appellant those portions of the reports that contained any exculpatory information. The trial court reviewed the undisclosed pages in camera and declined to provide the reports to appellant.

On appeal, appellant contends the composite drawing in the unrelated case and the undisclosed reports of the police officers could be exculpatory in nature and, therefore, the trial court erred in failing to require their disclosure.

As a general rule, the accused is not entitled to obtain statements made by prospective Commonwealth witnesses to police officers in connection with the investigation or prosecution of a criminal case. See Rule 3A:11(b)(2); see also Currie v. Commonwealth, 10 Va. App. 204, 209, 391 S.E.2d 79, 82 (1990); Taitano v. Commonwealth, 4 Va. App. 342, 349, 358 S.E.2d 590, 593 (1987). In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request

---

[3] The composite drawing was appropriately kept under seal in the record for our appellate review.

-

violates due process where the evidence is material either to guilt or to punishment."  Id. at 87.

> Under Brady, the Commonwealth is required to deliver that evidence which is favorable to the accused and which, if suppressed, would deprive the accused of a fair trial.  The nondisclosed evidence is considered "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  The Court is required to assess the reasonable probability of a different result in light of the totality of circumstances.

Currie, 10 Va. App. at 209, 391 S.E.2d at 82 (citations omitted).

In making a Brady challenge, "[a] defendant cannot simply allege the presence of favorable material and win reversal of his conviction.  Rather, [he] must prove the favorable character of evidence he claims has been improperly suppressed.  Speculative allegations are not adequate."  Hughes v. Commonwealth, 18 Va. App. 510, 526, 446 S.E.2d 451, 461 (1994) (citations omitted).  Where the Commonwealth and the defendant dispute the exculpatory nature of the evidentiary materials, the trial court may conduct an in camera review of the material to resolve the dispute.  See Bowman v. Commonwealth, 248 Va. 130, 135, 445 S.E.2d 110, 113 (1994).

In the instant case, the trial court properly conducted an in camera review of the contested materials.  See id.

-

("The trial court's determination of the question whether it should undertake the review of the disputed material is a discretionary matter."). Regarding the composite drawing, which was produced in an investigation of unrelated crimes, the trial judge reviewed the composite drawing and held that it was not exculpatory in nature. The sealed evidence provides no favorable information to the accused, and its exclusion did not deprive him of a fair trial. See Currie, 10 Va. App. at 209, 391 S.E.2d at 82.

We also agree with the trial court that the requested police reports were not exculpatory in nature. The Commonwealth disclosed all but two pages of Detective Quinones' report and an excised copy of Detective Ellman's report. The trial court conducted an in camera review of the undisclosed reports. We have reviewed the sealed materials and conclude, as did the trial court, that they are not exculpatory in nature. Under the totality of the circumstances, there is not a "reasonable probability of a different result" had the materials been disclosed. Currie, 10 Va. App. at 209, 391 S.E.2d at 82 (citations omitted).

Moreover, appellant concedes that he cannot identify specifically the ways in which the police reports are exculpatory. Rather, appellant alleges that the police reports "may contain inconsistent statements from the complaining witness. They may contain information from

-

other witnesses contrary to their testimony at trial or contrary to other witness' testimony at trial.  They may contain leads that counsel could have used to find other witnesses."  (Emphasis added).  Appellant has not alleged what exculpatory evidence existed in Quinones' or Ellman's reports and, as indicated in his arguments, he only hoped to find some exculpatory evidence.  These types of speculative allegations are inadequate to invoke the Brady mandate.  See Hughes, 18 Va. App. at 526, 446 S.E.2d at 461.  Accordingly, we conclude the trial court did not err in declining to provide the requested materials to appellant.

IV.  USE OF PRELIMINARY HEARING TRANSCRIPT

Appellant next contends the trial court erred in refusing to admit two portions of the preliminary hearing transcript of the victim's testimony.  In the first instance, defense counsel cross-examined the victim about the length of the encounter with her assailant.  She testified, "It was so fast, everything happened so quick, I couldn't tell if it was 30 seconds or 30 minutes.  I wasn't looking at my watch."  Defense counsel attempted to impeach the victim with her prior testimony.

> Q.  [D]o you recall me asking you [at the
> preliminary hearing] whether from the time
> you saw your attacker to the time you ran
> into your bedroom that 30 seconds or less
> had gone by and you answering yes?

-

A.   When I ran into my bedroom, well, I
don't understand the question.  It could be
that it was 30 seconds.  It could be that I
did answer yes, but everything was so fast
that I don't remember.

Q.   But you could have answered me a couple
of months ago that it was 30 seconds or
less, you admit that?

A.   No, no.  I couldn't tell you absolutely.

(Emphasis added).  The preliminary hearing transcript, which

appellant sought to introduce as impeachment evidence, contained

the following colloquy:

Q.   Okay.  Is it fair to say that from the
time you saw him until the time you ran into
the bedroom that 30 seconds or less had gone
by?

A.   Yes.

Q.   So it happened very quickly?

A.   Yes.

In the second instance, appellant attempted to

introduce the preliminary hearing transcript regarding the

victim's testimony about her description of the assailant.

At trial, the victim testified as follows:

Q.   The stuff on [appellant's] face you said
was like a rash?

A.   Something like a rash.

Q.   In fact, earlier you described them to
me like chicken pox?

A.   Something like that, something like
that.

-

Q.  Those marks on his face were similar to the marks that he had on his neck and arms, is that right?

A.  No.  It is just that when I pushed him you could see like a mark in here that he had.

Q.  But the marks on his face were similar to the marks you had seen on his arm?

A.  No, the ones on the arm are different because they were like lines.

Q.  Again, do you remember testifying back in September at this preliminary hearing in this case?

A.  Yes.

Q.  And at that time throughout that hearing you tried to be as truthful and honest as possible?

A.  Yes.

Q.  And at that time do you recall me asking you whether the thing you saw on his arms was like dots, like spots and you said they were spots just like you made?

A.  I told you then that he had some lines and . . . that they looked like some kind of a rash and I didn't tell you that they looked like spots.

    *        *        *        *        *        *        *

Q.  And do you remember me drawing circles on a paper for you and asking you if those were the marks he had on his arms?

A.  Yes.

Q.  And you said yes, those look like the marks?

A.  Yes.

-

(Emphasis added).  At the preliminary hearing, the victim testified as follows:

> Q.  Did you tell the police that [appellant had] marks on his neck or arms?
>
> A.  Yes, you could see something there, but it was the same thing as the chin and the arms.
>
> Q.  The thing that you saw on the arms, was it dots like this, spots?
>
> A.  They were like spots like you just made.
>
> Q.  Like circular.
>
> A.  Yes.
>
> Q.  Almost like chicken pox or something like that.
>
> A.  Yes.

In both instances, appellant was allowed to question the victim about her preliminary hearing testimony. However, the trial court refused to admit into evidence the actual preliminary hearing transcript.

Appellant argues that the victim was evasive in her trial testimony and failed to acknowledge that she made the above statements at the preliminary hearing.  He contends that since the victim's trial testimony was inconsistent with her preliminary hearing testimony, the transcript of the preliminary hearing should have been admitted into evidence for impeachment purposes or, in the alternative, under the past recollection recorded exception to the hearsay rule.  We disagree.

-

"'If a witness gives testimony that is inconsistent with a prior statement, . . . opposing counsel may cross-examine the witness as to the inconsistency.  In addition, all inconsistent portions of that prior . . . statement are admissible for impeachment purposes.'"  Waller v. Commonwealth, 22 Va. App. 53, 56, 467 S.E.2d 844, 846 (1996) (quoting Smith v. Commonwealth, 15 Va. App. 507, 511, 425 S.E.2d 95, 98 (1992)); see also Code § 19.2-268.1.[4]

"If a witness gives testimony that is inconsistent with a prior statement, or testifies that he does not recall making the prior statement, a sufficient foundation for impeachment has been laid and opposing counsel may cross-examine the witness as to the inconsistency."  Smith, 15 Va. App. at 511, 425 S.E.2d at 98.  However, if the witness admits making the statement, the prior inconsistent statement may not be proved by extrinsic

---

[4] Code § 19.2-268.1 provides in part:

> A witness in a criminal case may be cross-examined as to previous statements made by him in writing or reduced into writing, . . . but if it is intended to contradict such witness by the writing, his attention must, before such contradictory proof can be given, be called to the particular occasion on which the writing is supposed to have been made, and he may be asked if he did not make a writing of the purport of the one to be offered to contradict him, and if he denies making it, . . . it shall then be shown to him, and if he admits its genuineness, he shall be allowed to make his own explanation of it . . . .

-

evidence.  See Brown v. Peters, 202 Va. 382, 389, 117 S.E.2d

695, 699 (1961); Edwards v. Commonwealth, 19 Va. App. 568, 572,

454 S.E.2d 1, 3 (1995) ("If [the witnesses] admitted making the

prior inconsistent statements, appellant would have succeeded in

his impeachment.  If they denied the statements, their testimony

would have been subject to impeachment by other competent

evidence.").

In the instant case, the victim acknowledged her

preliminary hearing testimony.  In the first instance, she

admitted that "[i]t could be that it was 30 seconds.  It could

be that I did answer yes . . . ."  In the second instance, the

victim also admitted that she had previously described the marks

on her assailant's arms as being circular.  Having acknowledged

her prior testimony on both issues, even if the preliminary

hearing statements were inconsistent with her trial testimony,

the trial court correctly held that appellant was precluded from

introducing extrinsic evidence to impeach the victim.  See

Brown, 202 Va. at 389, 117 S.E.2d at 699.  Appellant was still

able to impeach the victim by questioning her about the prior

testimony, and the trial court did not err in refusing to admit

the preliminary hearing transcript.[5]

---

[5] Appellant's argument that the preliminary hearing
transcript should have been admitted under the "past
recollection recorded" exception to the hearsay rule is without
merit.  Under that rule, the "witness must lack a present
recollection of the event" and "must vouch for the accuracy of
the written memorandum."  Bailey v. Commonwealth, 20 Va. App.

V. SUFFICIENCY OF EVIDENCE

Finally, appellant contends the evidence was insufficient to prove beyond a reasonable doubt that he was the perpetrator of the crimes. He argues that the victim's identification was inconsistent with her identification at the preliminary hearing, was "tainted" and "unreliable" because of fear induced by the incident, and that comments by the police affected the validity of the photo spread. Additionally, he argues that the victim did not get a proper view of the assailant's face and she "probably" associated appellant with the true perpetrator because appellant had been in the victim's neighborhood earlier that week.

In determining the reliability of a witness' identification, we look to the factors enunciated in Neil v. Biggers, 409 U.S. 188 (1972), as significant circumstances that may be considered along with other evidence. See Charity v. Commonwealth, 24 Va. App. 258, 262-63, 482 S.E.2d 59, 61 (1997). These factors include the following:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

---

236, 240-41, 456 S.E.2d 144, 146 (1995). Here, neither of these prongs was met, and the trial court properly excluded the transcript.

-

<u>Biggers</u>, 409 U.S. at 199-200. "The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine the weight of the evidence, the credibility of witnesses, and the inferences to be drawn from proven facts." <u>Commonwealth v. Taylor</u>, 256 Va. 514, 518, 506 S.E.2d 312, 314 (1998).

In the instant case, the evidence established that on the morning of August 7, 1997, the victim identified appellant as her assailant from a six-photograph lineup shown to her by Detective Ellman. Viewed in the light most favorable to the Commonwealth, the evidence also established that Ellman did not tell the victim that her assailant would be one of the six individuals in the lineup. The authorities later showed the victim an enlarged photograph of appellant's left arm, without indicating that it was a photograph of appellant, and she identified it as a picture of her assailant's arm. She unequivocally identified appellant at the preliminary hearing and at trial as the perpetrator of the crimes. Here, the Commonwealth's evidence was competent, was not inherently incredible and was sufficient to prove beyond a reasonable doubt that appellant was, in fact, the perpetrator of the crimes.

For the foregoing reasons, we affirm appellant's convictions.

<u>Affirmed.</u>

-