COURT OF APPEALS OF VIRGINIA


Present:    Judges Frank, McClanahan and Senior Judge Coleman
Argued at Alexandria, Virginia


CLIFFORD M. SCHEID

                                                    MEMORANDUM OPINION* BY
v.       Record No. 2997-02-4                       JUDGE SAM W. COLEMAN III
                                                    NOVEMBER 25, 2003
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Robert W. Wooldridge, Jr., Judge

Lana Manitta (Mark J. Petrovich; Martin, Arif, Petrovich & Walsh,
on brief), for appellant.

Jennifer R. Franklin, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


       Clifford M. Scheid was convicted by a jury of murder.  Scheid contends the trial court

erred by refusing to admit expert testimony regarding the homicide investigation where the

issues concerning appropriate investigative procedures were beyond common experience.

Finding no error, we affirm the conviction.

                                          Facts

       Scheid lived with his seventy-five-year-old grandmother, the victim.  On February 25,

1999, Paulette Hamel knocked on the door of the victim's residence.  Scheid answered the door

and told Hamel that the victim was "downstairs and there's blood all around her."  Scheid

indicated to Hamel that he had not checked the victim's pulse, and he had not telephoned the

victim's daughters.  Hamel called the police.

_____

       * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Paramedics arrived at the house and determined the victim was dead.  Scheid told Officer Philjones that he had last seen the victim lying on the couch at about 8:00 p.m. the previous night.  Scheid also said that on the afternoon of February 25, he realized he had not seen the victim all day and he began looking for her.  He found the victim lying at the bottom of the basement stairs.  He shook her, trying to awaken her.  Soon thereafter, Hamel knocked on the door.

There was no sign of forced entry into the house.  The police discovered an elongated stain on the living room carpet which was determined to be the victim's blood.  Blood stains were found leading to the stairs and in the stairwell.  Blood consistent with the victim's DNA was found on Scheid's shoe and sock. The police searched the house, gutters, yard, shed, and outside trash.  The following day, the police searched the area dumpsters, a nearby area, sewers and drainage ditches, and they spoke to some of the neighbors.  They took fingerprints from a metal toolbox found in the basement and from a bank envelope found in the victim's purse.

At about 11:00 p.m. on February 25, Dr. Robert Zurowsky, a medical examiner, determined the victim had been dead between twelve and thirty-six hours.  Dr. Zurowsky also testified that the victim's skull was fragmented "to the point of multiple small skull fragments" and her skull felt like a "crushed eggshell."  The victim had suffered blunt force trauma to the head.  She had multiple rib fractures and an upper jaw fracture.  Dr. Zurowsky stated that she "was basically beaten to death with something."

Dr. Field performed an autopsy on the victim.  She testified the victim died as a result of skull fractures and cerebral trauma.  Dr. Field also stated that a fall down the stairs could not have caused the victim's skull fractures.  Dr. Field opined that the skull fractures were caused by more than one blow, but she stated that it was "remotely possible that a single blow could have done it."

Scheid gave several statements to the police that were both contradictory and/or inculpatory in some respects. Scheid first said he had not smoked in the basement, then he said he did. When asked if he had harmed the victim, Scheid said, "I didn't push my grandmother down the steps." After his initial statement, Scheid later said he wanted "to change [his] story." Scheid then stated that he found the victim at the bottom of the steps at about midnight on February 24 after he heard a "thumping" sound in the house. Scheid also said, "[Y]ou need to respect the fact that I'm her grandson whether I did it or not." Scheid asked the police, "If I had a mental disability and I could have done something, would I get parole or go to an institution?" Scheid once stated that he and the victim had argued the night before the victim was found and he had consumed alcohol and smoked marijuana. When asked whether the victim's death could have been an accident, Scheid replied, "It couldn't have been an accident. How could you hit somebody fifty times and it be an accident?"

At trial, Scheid testified that he awoke and heard "banging." He then found the victim at the bottom of the basement steps. Scheid denied that he killed the victim.

At trial, Scheid attempted to offer expert testimony on homicide investigations by asking the expert witness how he would have handled the investigations in hypothetical situations. The trial judge rejected this testimony and ruled:

> I don't believe it's relevant to the extent that this officer would testify as to what he would do under certain circumstances. Even to the extent that there is some testimony that may come from this witness regarding standards, even if I assume that the adequacy of the investigation by the police in this case, is a proper issue for the jury to consider, I am satisfied that the jury is capable on its own in deciding whether or not the police investigation in the case was proper and what effect that should have in relation to this trial.

### Discussion

"Where the admissibility of expert testimony is challenged on appeal, the standard of review is whether the trial court abused its discretion." Currie v. Commonwealth, 30 Va. App.

58, 64, 515 S.E.2d 335, 338 (1999). "Expert testimony is appropriate to assist triers of fact in those areas where a person of normal intelligence and experience cannot make a competent decision." Utz v. Commonwealth, 28 Va. App. 411, 423, 505 S.E.2d 380, 386 (1998) (citation omitted). "The expert testimony must be relevant, and the trial judge must determine whether the subject matter of the testimony is beyond a lay person's common knowledge and whether it will assist the trier of fact in understanding the evidence or in determining a fact in issue." Id. Conversely, where the facts and circumstances in evidence are such that people of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and drawing their own conclusions, expert opinions based on such evidence are inadmissible. See Rodriguez v. Commonwealth, 20 Va. App. 122, 126, 455 S.E.2d 724, 726 (1995).

In Rodriguez, we said that "[b]y asking an expert to render an opinion about the propriety of lineup procedures and the reliability of eyewitness identifications, a defendant in effect asks the expert to comment upon the credibility of the identifying witness, an issue clearly within the jury's province." Id. at 128, 455 S.E.2d at 727. We noted that people of ordinary intelligence are capable of understanding the inherent problems with lineup identifications and eyewitness testimony and of drawing rational conclusions based on the facts and circumstances. Id. We also noted in Rodriguez that the trial judge considered the proffered evidence and specifically found that issues dealing with the accuracy of lineup identification are common sense and that defense counsel may argue and point out the problems with lineup identifications in closing argument. Id. See also Currie, 30 Va. App. at 65, 515 S.E.2d at 339 (trial court properly excluded the proffered expert testimony about the unreliability of subsequent identifications and the effect of short viewing time, stress, and display of a weapon).

Similarly, the trial judge did not abuse his discretion by refusing to admit expert testimony on homicide investigations and the opinion from one police officer about how another

police officer should have conducted an investigation. Furthermore, by asking an expert to render an opinion on how the investigation was conducted and how the evidence was recovered, Scheid would have been asking the expert to comment on the weight to be given the evidence recovered during the investigation, an issue clearly within the jury's province. The jurors were people of ordinary intelligence; they were capable of understanding the inherent problems of gathering evidence and drawing rational conclusions based on the facts and circumstances and explanations of those officers who conducted the investigation.

Additionally, defense counsel was able to challenge the validity and thoroughness of the investigation by highlighting the perceived problems through cross-examination and closing argument. Defense counsel cross-examined the victim's family members about the investigating officers' lack of responsiveness to their ideas about what should be investigated. Defense counsel cross-examined the investigating officers and highlighted potential investigative techniques and avenues which the officers did not check or pursue, such as whether they checked for fingerprints. Defense counsel questioned police investigators about potential witnesses they did not identify or interview. In addition, defense counsel argued these points in closing argument to support his theory that the officers left many "stones unturned" in their investigation that may have supported the defense theory that an unknown intruder committed the murder. The jurors, people of ordinary intelligence, heard the evidence and the suggestions of problems in the gathering of evidence and were able to draw rational conclusions based on the facts and circumstances. The expert testimony proffered by the defense raised matters of common sense that were within a lay person's common knowledge.

The trial judge did not abuse his discretion by excluding the expert testimony regarding homicide investigations. Accordingly, the decision of the trial court is affirmed.

Affirmed.