PRESENT:  All the Justices

TIMOTHY JOSAAHN WATSON

v.  Record No. 181569

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE WILLIAM C. MIMS
December 12, 2019

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider whether the trial court abused its discretion in a criminal case by excluding expert testimony regarding eyewitness confidence and denying a proffered jury instruction regarding eyewitness identification.

I.  BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Joseph Jackson and Paul Abbey went to the Cheetah Lounge, a so-called "gentleman's club" in Virginia Beach, to celebrate Jackson's birthday.  As they arrived, another car pulled in after them and parked directly across from them.  Raiquan Turner exited and approached the passenger side of Jackson's car, where he briefly spoke with Abbey.  Timothy Watson also exited and approached Abbey for a cigarette.  Jackson did not interact with Turner or Watson while they were at his car.  Only after Jackson exited his car and approached the club did he see Watson's face.

Jackson and Abbey entered the club first and sat at the bar.  Turner and Watson entered the club shortly thereafter with Keith Mitchell, a friend, and Ericka Phillips, Watson's girlfriend.  The group walked in front of Jackson and Abbey before they sat at a table to the left of the bar.  They did not interact with Jackson and Abbey, who stayed at the bar, except for when Abbey left to talk with friends in the stage area.  Approximately forty-five minutes later, Watson and Phillips left.  Mitchell went back and forth to the bathroom several times before eventually

leaving alone. Turner made eye contact with Jackson and gave him a thumbs up before he too left.

Once outside the club, Watson said that he needed some money and wanted to rob somebody. He gave Turner a handgun and instructed Mitchell to move his car to another area of the parking lot. Mitchell did so, leaving Watson and Turner alone together.

After last call, which occurred about twenty minutes after Turner left, Jackson and Abbey also exited the club and walked toward Jackson's vehicle. The parking lot was "not well lit," but lights attached to the surrounding buildings provided some illumination. The club itself had flood lighting installed on the side of its building.

Turner then emerged from behind Jackson's car holding the gun. He pointed it at Jackson's head and demanded that he empty his pockets. As Jackson did so, a shot rang out and something struck his head. He fell to the ground, unable to tell whether he had been grazed by a bullet or pistol whipped. He remained on the ground, ears ringing, as Turner climbed on his back and removed his wallet.

While on the ground, Jackson heard a second gunshot and saw Abbey lying prone, dying from a gunshot wound to the head. Jackson testified at the preliminary hearing that he saw Watson standing over Abbey rifling through his pockets, but at trial he testified that both Watson and Turner were standing over Abbey. Mitchell later testified that he heard two gunshots and then saw Turner and Watson running toward the car. Once they were inside, they told Mitchell to drive. As Mitchell left the scene, Turner—still holding the handgun—said, "I think I shot him."

Immediately after the incident, Jackson met with two detectives at the scene. He gave a statement and reviewed video from the Cheetah Lounge's surveillance camera. Using the video,

2

Jackson identified Turner, Watson, Mitchell, and Phillips entering the club on the video and named Watson as the shooter. He made these identifications based on their stature and clothing as their faces were not apparent.

Ten days later, Jackson met with another detective and went through photo line-ups. Jackson identified both Turner and Mitchell with "one-hundred percent" confidence. He also identified Watson in the photo line-ups, but said he was only "eighty-five percent to ninety" percent confident in that identification. Nevertheless, he insisted that none of the other men pictured could have been Watson.

Based on the investigation, Watson was detained and ultimately charged with first-degree murder, two counts of robbery, two counts of use of a firearm in the commission of a robbery, and conspiracy to commit robbery. At the preliminary hearing, Jackson identified Watson a third time. Watson was wearing an inmate uniform with handcuffs and was sitting next to Turner and Mitchell. Jackson stated that he was "positive" and one-hundred percent confident in his identification of Watson.

At trial, Watson sought to introduce expert testimony from Dr. Brian Cutler, a recognized expert in matters concerning eyewitness identifications. Watson sought to use Cutler's testimony to introduce factors that he believed negatively affected Jackson's eyewitness identification and thus reduced his reliability. The trial court recognized Cutler's qualifications, then permitted Watson to proffer his testimony through an abbreviated examination outside the jury's presence.

The trial judge actively participated along with counsel during Cutler's proffer, asking detailed questions about aspects of his testimony. For instance, as Cutler opined that eyewitnesses' confidence is malleable and can be influenced by factors after an identification has

3

been made, the judge asked him to provide examples of feedback factors that validate eyewitnesses' identifications and whether in his "review of the case materials . . . there [was] any evidence of feedback factor[s] coming into play in Mr. Jackson's identification of perpetrators." Cutler replied that a witness learning that another witness had identified the same individual, that the police believe the individual is the perpetrator, or that additional evidence implicates the suspect are the "kind[s] of information that can inflate confidence." He additionally noted that the process of making multiple identifications and identifying the same person on multiple occasions can also raise confidence. In response to the judge's specific question about whether evidence of those factors existed in this case, Cutler acknowledged that, based on his review of the case materials, he "didn't see evidence of [confidence-increasing] feedback per se" and was "not aware of any direct feedback given to [Jackson]," but "it appeared there were changes in [his] confidence." Moreover, Cutler concluded in his report that "[w]ithout a more explicit and descriptive statement of eyewitness's confidence at the time of the lineup, there was no way of knowing whether confidence inflation occurred."

Watson also sought to introduce Cutler's testimony on unconscious transference, which he explained occurs when a witness mistakenly identifies a familiar person for a perpetrator. He stated the "transference" aspect of the phenomenon occurs when a witness mentally transfers the identity of a familiar person to that of the perpetrator, and that the process is unconscious because the witness does not realize the transference is happening. The judge asked whether "[u]nconscious transference requires that [eyewitnesses] predicate some sort of visual recognition of the person before the events giving rise to need for an identification . . . [such that] [t]hey would have to have seen the person somewhere" before. Cutler agreed and opined that the phenomenon is likely to occur when the witness either already knows or "ha[s] a good look at

4

the familiar person to begin with," but does not get a good look at the perpetrator. He further noted that unconscious transference could affect photo array identifications. But, much like his comments on eyewitness confidence, Cutler acknowledged that "[t]here was nothing about the photo array process . . . that I reviewed that would increase the likelihood of unconscious transference."

At the proffer's conclusion, the trial court excused Cutler and entertained arguments on his testimony's admissibility. It then admitted his testimony regarding the effects of stress on eyewitnesses, eyewitnesses' tendency to focus on weapons, and the attention-dividing effects of multiple perpetrators, but excluded the testimony on unconscious transference, eyewitness confidence, confidence feedback, and confidence inflation. Based on its detailed consideration of the proffer and parties' arguments, the trial court found that the testimony concerning eyewitness confidence was "common sense" and "within the common province and knowledge of the ordinary juror." It excluded the unconscious transference testimony as irrelevant because Cutler stated that he saw no evidence of transference in this case.

Although he was not permitted to introduce expert testimony on eyewitness confidence and unconscious transference, Watson nonetheless addressed these issues during trial. He employed concepts related to unconscious transference in his cross-examination of Jackson, which focused on Jackson's confidence in his identifications. He also argued both concepts in his closing argument.

After the close of evidence, Watson proffered a jury instruction on the subject of eyewitness identification testimony. Although he argued that the instruction was an accurate statement of the law because it was Model Jury Instruction 2.800 verbatim and the evidence

5

supported giving it, the trial court refused the instruction. The jury ultimately convicted Watson, and the trial court imposed the jury's recommended sentence of life plus 53 years' imprisonment.

Watson timely filed a petition for appeal, which the Court of Appeals denied by per curiam order. In denying the petition, the Court of Appeals held that the trial court did not abuse its discretion in excluding the expert testimony on eyewitness confidence and unconscious transference because the testimony was irrelevant or within the common experience of the jurors. It further reasoned that Watson cross-examined Jackson about transference and his confidence in his identifications and argued both concepts in his closing argument, which allowed the jury to consider the concepts in evaluating the credibility of Jackson's identification testimony.

The Court of Appeals also ruled that the trial court did not abuse its discretion in denying Watson's proffered jury instruction. It found that the instructions given by the trial court fully addressed concepts of witness credibility, the Commonwealth's burden of proving Watson's identity beyond a reasonable doubt, and the presumption of innocence. It concluded that Watson's detailed instruction was duplicative and would have improperly focused the jury's attention on the enumerated factors outlined in the proposed instruction. The Court of Appeals also noted that Watson raised many of the identification issues outlined in the instruction during closing argument to the jury.

We awarded Watson this appeal.

## II. ANALYSIS

Watson's assignments of error challenge the exclusion of Cutler's expert testimony regarding eyewitness confidence and unconscious transference as well as the refusal of the proffered jury instruction on eyewitness identification testimony.

A. Expert Testimony

Watson first contends that the trial court erred by limiting the scope of Cutler's testimony regarding eyewitness confidence and unconscious transference. He argues that the identification issues are "highly specialized and counterintuitive," rendering them beyond the jury's common knowledge.

This Court reviews the trial court's ruling excluding evidence for abuse of discretion. *Payne v. Commonwealth*, 292 Va. 855, 866 (2016) (citing *Lawlor v. Commonwealth*, 285 Va. 187, 229 (2013)). The purpose of expert testimony is to assist the trier of fact in understanding the evidence. *Payne v. Commonwealth*, 277 Va. 531, 542 (2009) (citing *Velazquez v. Commonwealth*, 263 Va. 95, 103 (2002)). For this reason, expert testimony is admissible only when it concerns matters that are not within the jury's ordinary knowledge. *Id.* (citing *Compton v. Commonwealth*, 219 Va. 716, 726 (1979)).

Although this Court has not addressed in what circumstances expert testimony regarding eyewitness identifications is admissible, the Court of Appeals has considered the issue on several occasions. It has held "that in some 'narrow' circumstances, expert testimony [about eyewitness identifications] may be useful to the jury, including in the following areas: 'such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference.'" *Payne v. Commonwealth*, 65 Va. App. 194, 221 n.22 (2015) (quoting *Currie v. Commonwealth*, 30 Va. App. 58, 64–65 (1999)), *aff'd on other grounds*, 292 Va. 855 (2016). Nevertheless, the Court of Appeals has emphasized that, even in circumstances where expert testimony may be useful to the jury, "[a] trial court retains the discretion to permit or forbid such testimony." *Id.*

7

The Court of Appeals considered this issue at length in *Currie v. Commonwealth*, 30 Va. App. at 62. In that case, the trial court excluded expert testimony regarding the correlation between eyewitness certainty and accuracy, the effect of viewing time and stress on eyewitness accuracy, and the concept of transference because it concluded that these topics "were within the lay knowledge of the average juror and could be adequately argued to the jury in closing arguments." *Id.* at 63. It also precluded the expert from testifying about the specific identification at issue in the case because "[s]uch testimony would usurp the function of the jury to determine the credibility of witnesses." *Id.* Currie argued that the proffered expert testimony was "vital to [the] jury's understanding of whether the identification made [was] correct." *Id.* at 63–64. He contended that his expert should have been allowed to explain the psychological and scientific principles underlying the identification process to the jury. *Id.*

The Court of Appeals held that the relationship between eyewitness confidence and accuracy of identification was not among the "narrow" circumstances for which expert testimony might be appropriate. *Id.* at 64–65. It relied on another of its opinions to affirm that "'the unreliability of a subsequent identification' and 'the prevalence of misidentification in situations involving stress, poor lighting, or delay' are topics 'within the lay knowledge of the jurors.'" *Id.* at 64 (quoting *Rodriguez v. Commonwealth*, 20 Va. App. 122, 129 (1995)). Additionally, it noted that Currie's counsel addressed the issues limited by the trial court, like transference, in his argument to the jury. *Id.* at 66. The jury was thus capable of evaluating whether the victim's identifications of Currie were reliable or whether the identifications were incorrect based on the proffered eyewitness identification problems. *Id*. For those reasons, it held that the trial court did not abuse its discretion in excluding the proffered expert testimony. *Id.*

8

As in *Currie*, the trial court in this case did not allow appellant's expert to testify on issues relating to eyewitness identification because they were within the common experience of the jurors. The trial court thoroughly considered these concepts as evidenced by its extensive questioning and engagement with Cutler during the proffer. Its ruling excluding the testimony concerning eyewitness confidence is consistent with existing Virginia precedent regarding the exclusion of expert testimony.

Although the Court of Appeals has recognized that unconscious transference is among the narrow circumstances in which expert testimony may be useful to a jury, the trial court in this case did not abuse its discretion by excluding it as irrelevant. Only relevant expert testimony may be introduced. In this case, Cutler acknowledged that there was no indication that unconscious transference occurred. *See, e.g.*, *Farley v. Commonwealth*, 20 Va. App. 495, 499 (1995) ("There also must be a connection between the [expert testimony] and the factual dispute in the case."). Accordingly, the unconscious transference testimony was irrelevant and therefore inadmissible.

Additionally, like Currie, Watson had the opportunity to argue the identification issues to the jury in cross-examination and during closing arguments. Thus, even without the expert testimony, the jury had the opportunity to consider these concepts in evaluating the credibility of Jackson's identification testimony and whether his identification was reliable. Accordingly, the trial court did not abuse its discretion by following *Currie* and excluding the testimony.

B. Jury Instructions

Watson next contends that the trial court erred by refusing the jury instruction regarding eyewitness identifications because the instruction was an accurate statement of law and was supported by the evidence. This Court

9

> review[s] jury instructions to see that the law has been clearly
> stated and that the instructions cover all issues which the evidence
> fairly raises. This is a mixed question of law and fact. It is error to
> give an instruction that incorrectly states the law; whether a jury
> instruction accurately states the relevant law is a question of law
> that we review de novo. However, jury instructions are proper
> only if supported by the evidence, and more than a scintilla of
> evidence is required. When reviewing a trial court's refusal to give
> a proffered jury instruction, we view the evidence in the light most
> favorable to the proponent of the instruction.

*Payne*, 292 Va. at 869 (quoting *Lawlor*, 285 Va. at 228–29). "Nevertheless, a court may exercise

its discretion and properly exclude an instruction that both correctly states the law and is

supported by the evidence when other granted instructions fully and fairly cover the relevant

principle of law." *Id.* (quoting *Lawlor*, 285 Va. at 256).

We most recently considered a challenge to refusal of a jury instruction regarding

eyewitness identification in *Payne v. Commonwealth*, 292 Va. at 867. In that case, Payne

asserted that the circuit court erred in refusing his proffered instruction because it was a correct

statement of the law and supported by the evidence. *Id.* at 867–68. He further contended that

the proffered instruction was not duplicative of the other granted jury instructions. *Id.* at 868. In

light of the refusal, Payne argued that the granted jury instructions were insufficient to inform the

jury that it could consider the reliability of an eyewitness's identification. *Id.* at 870.

We rejected Payne's arguments, holding that his "very specific[]" instruction was either

identical in part to or otherwise adequately covered by the given instructions. *Id.* at 869–71. We

further held that the proffered instruction would have improperly focused the jury's attention on

the enumerated factors, thereby suggesting that those factors were exclusive or entitled to special

consideration. *Id.* at 871. Such an instruction would have deleterious effects:

> While it may be appropriate during closing argument for each
> *party* to focus the jurors' attention on the evidence it prefers them
> to consider during their deliberations, it is not appropriate for the

*court* to do so in a jury instruction because, under the law of
Virginia, the jury is free to weigh the evidence how it chooses.

*Id.* Lastly, we observed that Payne's thorough cross-examination of the eyewitness successfully

presented several facts to the jury that could have led it to conclude that the eyewitness's

identification was unreliable. *Id.* at 872. That the jury ultimately elected not to do so was "not

attributable to a defect in the court's instructions." *Id.* Accordingly, we found no reversible

error in refusing the instructions. *Id.*

Watson argues that this case is effectively a sequel to *Payne* because the instruction he

proffered was drafted by this Court's Model Jury Instruction Committee in response to our ruling

in *Payne*. He notes that this Court specifically contemplated such an instruction: "one that

merely mentioned factors to consider, and did not elevate any particular factors above all others."

Thus, because the instruction accurately stated the law and was supported by the evidence, and

because the identification issue was crucial to his theory of defense, Watson contends the refusal

was error.

This Court has "long recognized [the] dangers inherent in eyewitness identification

testimony." *Daniels v. Commonwealth*, 275 Va. 460, 464 (2008). The United States Supreme

Court has observed that "[t]he vagaries of eyewitness identification are well-known; the annals

of criminal law are rife with instances of mistaken identification." *Id.* (quoting *United States v.

Wade*, 388 U.S. 218, 228 (1967)). "[B]oth archival studies and psychological research suggest

that eyewitnesses are frequently mistaken in their identifications." Jennifer L. Devenport et al.,

*Eyewitness Identification Evidence*, 3 Psychol. Pub. Pol'y & L., 338, 338 (1997). Because

eyewitness identification is so persuasive to jurors, "eyewitness '[m]isidentification is widely

recognized as the single greatest cause of wrongful convictions in this country.'" *State v.

Henderson*, 27 A.3d 872, 885 (N.J. 2011) (quoting *State v. Delgado*, 902 A.2d 888, 895 (2006))

11

(alteration in original). Both state and federal courts "have opined that courts should guard against a jury assuming that admitted eyewitness identification testimony is unquestionably reliable and credible simply because it was admitted in evidence." *Daniels*, 275 Va. at 465.

Some jurisdictions have permitted—and others have mandated—a specific jury instruction alerting the jurors of the risks of eyewitness identification testimony. *Id.* This Court, however, has not adopted a rule that would require

> a cautionary instruction on eyewitness identification in every case in which it is requested and the identification of the defendant is central to the prosecution's case. Neither have we opined that such an instruction would never be appropriate, nor that a court would abuse its discretion by granting such an instruction.

*Id.* (citing *Lincoln v. Commonwealth,* 217 Va. 370, 375 (1976)). Instead, we have consistently ruled that the decision to give or refuse instructions on eyewitness identification rests in the sound discretion of the trial courts. For instance, we have held that while an instruction "was a correct statement of the legal principles involved and the trial court, in its discretion, could properly have given the instruction, it does not follow that it was reversible error to refuse it." *Lincoln v. Commonwealth*, 217 Va. 370, 375 (1976). Likewise, we have affirmed judgments in which the trial court refused to give a cautionary instruction on eyewitness identification because the matters contained in the proposed instructions were covered by other instructions. *Daniels*, 275 Va. at 465. As we observed in *Payne*, a court may properly exclude an instruction that both correctly states the law and is supported by the evidence as long as other granted instructions "fully and fairly cover the relevant principle of law." 292 Va. at 869.

Given these principles, the trial court did not abuse its discretion in refusing the instruction. It instructed the jury on its role as the judges of the facts, the credibility of the witnesses, and the weight of evidence. It also provided the jury with instructions on the

12

presumption of innocence and the Commonwealth's burden of proving appellant's identity beyond a reasonable doubt. These granted instructions addressed Watson's essential defense theory that Jackson's eyewitness testimony lacked credibility.

In *Payne*, we did not find it "difficult to foresee a defendant proffering a jury instruction similar to Payne's, but drafted to avoid the problem of focusing the jury's attention on a limited number of factors affecting the reliability of an eyewitness identification." 292 Va. at 872. As we observed, "[p]rovided that such an instruction is supported by the evidence, it would correctly state the law and a trial court would not err by giving it, *at its discretion*." *Id.* (emphasis added). There is no question that the model instruction Watson proffered was supported by the evidence and was otherwise the sort of instruction we anticipated in *Payne*. *Id.* Ultimately, however, this assignment of error turns on an exercise of the trial court's discretion. In light of the totality of the record, the trial court acted within its permissible discretion in declining to give the proffered instruction.

Finally, we note that Watson thoroughly cross-examined Jackson and in doing so presented the jury with information it could have relied upon to find his testimony implausible. Watson additionally directed the jury's attention to these factors during his closing arguments. That the jury rejected Watson's evidence and found the testimony credible is "not attributable to a defect in the court's instructions." *Id.* at 872. Accordingly, we find no reversible error in the judgment of the Court of Appeals affirming the trial court's refusal of Watson's proffered instruction.

## III. CONCLUSION

For the foregoing reasons, the trial court did not abuse its discretion in excluding Cutler's testimony regarding matters of eyewitness confidence because it fell within the jury's common

knowledge. It properly excluded his testimony regarding unconscious transference as irrelevant because Cutler acknowledged that unconscious transference did not appear to have occurred in this case. Finally, the trial court acted within its discretion in refusing Watson's proffered jury instruction because the principles of law contained in the proffered instruction were fully and fairly covered by other instructions addressing witness credibility.

*Affirmed.*


JUSTICE McCULLOUGH, concurring.

I join the majority opinion, but I write separately to highlight the need for thoughtful consideration of expert testimony and/or jury instructions with respect to eyewitness testimony. While expert assistance or a jury instruction is unnecessary in many commonly encountered situations involving eyewitness testimony, there are times when an expert or carefully tailored jury instructions will assist the court or the jury in sifting through a sincere but perhaps mistaken eyewitness identification. Extensive social science research has uncovered a variety of phenomena that may mislead a factfinder into crediting flawed eyewitness testimony. For example, a witness's recollection may be tainted by suggestive police procedures, greater difficulty in making cross-racial identifications, diminished reliability due to focus on a weapon, or unconscious transference. Extensive evidence also documents the weakness of the correlation between a witness's confidence and the accuracy of the witness's recollection. Flawed eyewitness testimony has led to a non-trivial number of wrongful convictions. The record in this case reflects a commendable rigor and thoughtfulness by the trial judge in handling the issue.