COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, Petty and AtLee
Argued at Lexington, Virginia


DEANTE LAMAR PAYNE

                                                        OPINION BY
v.        Record No. 1044-13-3                    JUDGE RICHARD Y. ATLEE, JR.
                                                        SEPTEMBER 8, 2015
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROANOKE COUNTY
James R. Swanson, Judge

Aaron B. Houchens (Erin B. Ashwell; Stanley, Houchens & Griffith;
Woods Rogers PLC, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

*Amicus Curiae*:  Virginia Association of Criminal Defense
Lawyers (Marvin D. Miller; John R. Maus; Law Offices of Marvin
D. Miller; Law Office of John R. Maus, on briefs), for appellant.


A jury convicted Deante Lamar Payne of robbery and use of a firearm in the commission

of a robbery.  Payne argues that the trial court erred by (1) refusing his jury instruction regarding

eyewitness testimony, (2) refusing his jury instruction regarding the reliability of eyewitness

testimony in the presence of a weapon, (3) refusing to admit certain evidence, and (4) refusing to

provide him with funds to hire an expert witness.  We find no error, and affirm the convictions.

I.  BACKGROUND

On appeal of criminal convictions, we view the facts in the light most favorable to the

Commonwealth, and draw all reasonable inferences from those facts.  Derr v. Commonwealth,

242 Va. 413, 424, 410 S.E.2d 662, 668 (1991).  However, "[w]hen considering whether a trial

court abused its discretion by denying a defendant's proffered instruction, this Court 'view[s] the

facts relevant to the determination of that issue in the light most favorable to [the defendant].'" Miller v. Commonwealth, 64 Va. App. 527, 547, 769 S.E.2d 706, 716 (2015) (second and third alterations in original) (quoting Commonwealth v. Cary, 271 Va. 87, 90-91, 623 S.E.2d 906, 907 (2006)).

Payne was the proponent of the two refused jury instructions, so we view the facts in the light most favorable to him when reviewing assignments of error (1) and (2). We view the facts in the light most favorable to the Commonwealth when reviewing assignments of error (3) and (4). To make this distinction clear, we present the facts in Part I.A. in the light most favorable to the Commonwealth, and in Part I.B. in the light most favorable to Payne.

A. Facts in the Light Most Favorable to the Commonwealth

The facts viewed in the light most favorable to the Commonwealth are as follows. On November 25, 2011, Payne placed an advertisement ("the ad") on Craigslist, a free online classified advertisement service. The ad offered to sell a laptop computer at an attractive price. Philip Via ("the victim"), a dealer in used electronics, exchanged a series of text messages with an unknown individual, using the phone number listed in the ad.

The victim agreed to meet the unknown party that same day, and arrived at the agreed-upon location (an apartment complex in Roanoke) between 8:00 p.m. and 8:30 p.m. It was dark outside. The victim "backed [his] car under a street light" and parked "close to the pool there, where it's well lit." The victim watched a man later identified as Payne exit a laundry room, walk across the parking lot, and approach the victim's car. The victim "could see his face once he got about half the distance out of the laundry room there." When asked at trial if he had any trouble seeing Payne's face when Payne came to the car, the victim answered "No, no, none whatsoever." Roanoke County Police Department Officer John Musser ("Officer Musser") described the parking lot as "fairly well lit," testifying that "[t]here were street lights out there as

- 2 -

well." At the car, the victim and Payne were "three to five feet" apart. Payne told the victim that the laptop was charging, and asked the victim if he wanted to come inside to look at it. The victim agreed, and after Payne turned and started walking back toward the laundry room, the victim placed his wallet and money in the center console of his car, exited the car, and followed Payne.

The victim walked behind Payne into the laundry room, which was approximately ten feet long. After the victim stepped into the laundry room, a second man grabbed him. The second man placed a knife to the victim's side. This man and Payne began shouting at the victim "Give it up, give it up. We know you've got it on you." The second man went through the victim's pockets, which contained only the victim's cell phone and car keys. Eventually, Payne "pulled out a gun and pointed it at" the victim. While pointing the gun at the victim, Payne said again "give it up," and "we know you've got it on you." Payne was "seven to eight feet away." Eventually, Payne and the other man left the laundry room, taking the victim's cell phone with them. As they exited the laundry room, Payne and the other man said "Don't come through this doorway, or we will shoot you," or similar words. The victim was with Payne and the other man in the laundry room for "a couple minutes."

According to the victim, the laundry room was illuminated by "florescent [sic] lighting" which made it "bright enough to see what was going on" and was "just a little bit dimmer" than the lighting in the courtroom at trial. When asked if he had any trouble seeing Payne's face while in the laundry room, the victim testified "None whatsoever." Officer Musser described the laundry room as "very well lit inside," and testified "I did not have to use my flashlight to see normally." The victim saw the gun Payne was pointing, but also saw Payne's face, testifying "The gun is probably an inch, inch and a half wide. So there's plenty of room there to view the face [sic] that's holding the gun . . . . I didn't stare at a gun. I saw the gun, and then I could see

- 3 -

the person who was holding it." After Payne and the other man left the laundry room, the victim called 911.

Detective Keshia Saul ("Detective Saul") of the Roanoke County Police Department ultimately identified Payne as the man who posted the ad on Craigslist. During an interview with Detective Saul, Payne admitted posting the ad, but said he did so on behalf of his cousin Dustin. Payne denied any part in or knowledge of the robbery. He suggested a man he knew only as "Boonie" might be involved. Detective Saul took a photo of Payne, and placed it in a photo lineup[1] along with photos of five men of similar appearance. On January 23, 2012, Detective Saul showed this photo lineup to the victim, and the victim identified Payne as the man with the gun who robbed him.

Initially, Payne's cousin Dustin was the only person charged in connection with the robbery. Dustin's preliminary hearing was held in the Roanoke County General District Court on February 27, 2012. The Commonwealth subpoenaed Payne as a witness in his cousin's preliminary hearing. The victim noticed Payne in the back of the courtroom and recognized him

---

[1] A photo lineup is an investigative process during which the witness to a crime is shown photos of a suspect or suspects. (The term photo lineup distinguishes this process from a traditional lineup, in which individuals are assembled for live viewing by the witness.) Before each photo lineup, Detective Saul read the following instructions to the victim:

1. Prior to showing the lineup, caution the witness that the offender may or may not be in the lineup.
2. Instruct the witness if the offender is seen in the lineup, he/she may not appear exactly the same as on the date of the incident because features such as clothing, head or facial hair can change.
3. Tell the witness—"IF YOU SEE THE PERSON WHO DID THIS CRIME, POINT HIM/HER OUT."
4. Show only one photograph at a time in the same sequence as you have listed below.
5. All photographs must be shown even if the witness identifies a suspect tentatively.
6. Include a copy of this worksheet with your Case File and forward the original to Records[.]

immediately as the other man involved in the robbery. Police arrested Payne that day. In a recorded telephone call from the jail, Payne said "They got me right in the courtroom, you know . . . . All of a sudden he recognized me." The day Payne was arrested, however, Detective Saul e-mailed a Roanoke County Assistant Commonwealth's Attorney and expressed reservations about obtaining warrants for Payne, because she was "still not sure he was involved" and "he appeared to be truthful."

On May 30, 2012, Detective Saul showed the victim a second photo lineup. This photo lineup also contained six photos. Detective Saul included among the six photos the same photo of Payne used in the first photo lineup. She also included a photo of Boonie, the man whom Payne suggested may have been involved. The victim again selected Payne, and no one else. At trial, the Commonwealth asked the victim if he had any trouble recognizing Payne in either photo lineup. He replied: "None whatsoever. That—his face is—it's burnt in my brain, probably for life." Finally, at Payne's trial, the victim identified Payne as the man with the gun who robbed him.

### B. Facts in the Light Most Favorable to Payne

The facts viewed in the light most favorable to Payne are as stated above, with the following distinctions. We assume that the extent of Payne's involvement in the crime was placing the ad, that he knew nothing about any planned robbery, and that he was not present at the robbery. Notwithstanding the victim's testimony to the contrary, we assume that the victim was, in fact, focused to the point of distraction on the gun and the knife and that the reliability of his identification of his assailant was compromised as a result of this focus on the weapons. We assume several other things explicitly denied by the victim on cross-examination. We assume that, after his initial identification of Payne in a photo lineup, the victim was influenced in his subsequent identifications by the fact that he had already identified Payne once, and by the fact

- 5 -

that the same photo of Payne was used in both photo lineups. We assume that the victim was remembering his prior identification of Payne, and not remembering the actual perpetrator of the crime. Finally, we assume that, after identifying Payne once, the victim was committed to the identification and did not want to express any uncertainty when given subsequent opportunities to identify (or not to identify) Payne.

## II. ANALYSIS

### A. Instructions on Eyewitness Testimony and Weapons Focus

Payne assigns error to the trial court's rejection of two guilt-phase jury instructions.[2] We review a trial court's decision to refuse a jury instruction for abuse of discretion. King v. Commonwealth, 64 Va. App. 580, 586, 770 S.E.2d 214, 217 (2015) (en banc). However, "'whether a jury instruction accurately states the relevant law is a question of law that we review de novo.'" Lawlor v. Commonwealth, 285 Va. 187, 228, 738 S.E.2d 847, 870 (2013) (quoting Orthopedic & Sports Physical Therapy Assocs., Inc. v. Summit Grp. Props., LLC, 283 Va. 777, 782, 724 S.E.2d 718, 721 (2012) (internal quotation marks omitted)). In reviewing jury instructions, our "'sole responsibility . . . is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" King, 64 Va. App. at 586-87, 770 S.E.2d at 217-18 (quoting Molina v. Commonwealth, 272 Va. 666, 671, 636 S.E.2d 470, 473 (2006)). "'A defendant is entitled to have the jury instructed only on those theories of the case that are supported by [more than a scintilla of] evidence.'" Id. at 587, 770 S.E.2d at 218 (alteration in original) (quoting Eaton v. Commonwealth, 240 Va. 236, 255, 397 S.E.2d 385, 397 (1990)). "'If a proffered instruction finds any support in credible evidence,' however, 'its refusal

---

[2] The Virginia Association of Criminal Defense Lawyers, as *amicus curiae*, adopts Payne's first and second assignments of error, but not his third or fourth assignments of error (which we discuss below in Part II.B and II.C).

is reversible error.'" Id. (quoting McClung v. Commonwealth, 215 Va. 654, 657, 212 S.E.2d 290, 293 (1975)).

Payne first assigns error to the trial court's refusal "to adequately instruct the jury regarding eyewitness testimony where the victim made a cross-racial identification based on a brief encounter at night under extreme stress." He next assigns error to the trial court's refusal "to instruct the jury on the reliability of eyewitness testimony where the person making the identification was threatened with two weapons and in fear of his life." We hold that the trial court did not abuse its discretion by rejecting either of Payne's proffered instructions.

### 1. Proffered Instruction 1

Payne proffered the following jury instruction ("Proffered Instruction 1"):

> The Court instructs the jury that one of the disputed issues in this case is the identification of the defendant as the person who committed the offense(s) charged in the indictment. The Commonwealth has the burden of proving this issue beyond a reasonable doubt.
>
> In considering whether the Commonwealth has proven beyond a reasonable doubt that the defendant was the person who committed the offense(s) charged in the indictment, you may consider the following with regard to an identification witness's testimony:
>
> (1) the witness's opportunity to observe the person(s) committing the crime, which includes the amount of time of the observation and the physical conditions such as lighting, distance, or obstructions present at the time of the observation;
>
> (2) the witness's degree of attention at the time of the observation, whether the witness was under stress, fear or similar situations, and whether the witness had occasion to see or know the person in the past;
>
> (3) whether the witness gave a description of the person after the crime and if so, the accuracy of such description and the length of time after the offense that the description was given; and
>
> (4) whether the witness made any subsequent identification of the person after the offense, the circumstances surrounding such

subsequent identification, the witness's level of certainty at such subsequent identification, and the time between the offense and the subsequent identification.

The trial court rejected Proffered Instruction 1[3] on the basis that the "legal principles applicable to this case" were fully and fairly covered by Instructions 1 through 18, and because the proffered instruction might confuse the jury. We agree.

First we address the portion of Payne's assignment of error alleging that the trial court failed "to adequately instruct the jury regarding eyewitness testimony where the victim made a cross-racial identification . . . ." A cross-racial identification occurs when a person of one race identifies a person of a different race. Legal scholars have been writing about the phenomenon of cross-racial identification errors for decades. See, e.g., Sheri Lynn Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 Cornell L. Rev. 934 (1984) (describing numerous studies and experiments from the field of psychology showing the statistical unreliability of cross-racial identifications, particularly when majority-race individuals identify minority-race individuals, and proposing various mechanisms to address such unreliability in criminal trials); John P. Rutledge, They All Look Alike: The Inaccuracy of Cross-Racial Identifications, 28 Am. J. Crim. L. 207 (2001) (discussing the problem of cross-racial identification errors, and reviewing the attempts of various jurisdictions to address the problem).

While we acknowledge that other courts have confronted the issue of cross-racial identification,[4] we decline to address the issue as it relates to this assignment of error for two

---

[3] Although the trial court refused to give the entire proffered instruction, it did give the first two sentences alone as Instruction No. 4.

[4] See, e.g., United States v. Jernigan, 492 F.3d 1050, 1054 (9th Cir. 2007) ("Cross-racial identifications, such as the eyewitness accounts offered against [the defendant], are particularly suspect."); United States v. Harris, 995 F.2d 532, 535 (4th Cir. 1993) (excluding the expert testimony at issue but noting "[t]he narrow circumstances held sufficient to support the introduction of expert testimony have varied but have included such problems as cross-racial identification"); State v. Henderson, 27 A.3d 872, 907 (N.J. 2011) ("Cross-racial recognition

- 8 -

reasons. First, the trial record is factually silent as to the race of the victim. At trial, Payne's attorney raised the issue of cross-racial identification only twice: in voire dire[5] and in his opening statement.[6] Neither assertion holds any evidentiary weight. Viewing the evidence in the light most favorable to Payne does not require that we create evidence that he never presented in the trial court. The jury was free to observe the victim and to guess at his race, but this Court has no such freedom. We may presume no more than the record contains, and the record here contains no photograph of the victim, no questioning of the victim as to his race, and no judicial notice of the victim's race. For this reason, we cannot reach the issue of cross-racial identification as it pertains to Proffered Instruction 1.

The second reason we decline to address the issue of cross-racial identification as it relates to this assignment of error is that Proffered Instruction 1 makes no reference to cross-racial identification. Though Payne mentions the alleged cross-racial nature of the identification as a reason supporting his claim that the trial court inadequately instructed the jury, Proffered Instruction 1 itself is silent on the issue of cross-racial identification.

---

continues to be a factor that can affect the reliability of an identification."); Commonwealth v. Gomes, 22 N.E.3d 897, 921-22 (Mass. 2015) (proposing a model jury instruction stating in part that "research has shown that people of all races may have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race"), modified in part, Commonwealth v. Bastaldo, 32 N.E.3d 873, 876-77 (Mass. 2015). This Court has addressed the issue of cross-racial identification in passing, as it relates to expert testimony. See Rodriguez v. Commonwealth, 20 Va. App. 122, 127, 455 S.E.2d 724, 727 (1995) (describing "'such problems as cross-racial identification'" as among the "'narrow'" circumstances where expert testimony might be appropriate (quoting Harris, 995 F.2d at 535)). And several states (California, Maryland, Massachusetts, Missouri, New Jersey, and New York) that have model jury instructions addressing eyewitness testimony have specific provisions within those instructions addressing cross-racial identifications. See sources cited infra note 8.

[5] "Has anyone—when I say the words 'cross-racial identification,' does anybody have an understanding of what that means?"

[6] "Mr. Via's identification is also cross-racial, meaning Mr. Via is white. My client is black."

Eyewitness identification is powerful evidence. "'[T]here is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says "That's the one!"'" Watkins v. Sowders, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) (quoting E. Loftus, Eyewitness Testimony 19 (1979)). Short of a confession, or the capture of a crime on video, eyewitness identification is often the strongest, and sometimes the only, means of proving a case. Like any form of evidence, however, it is imperfect. An eyewitness may lie. An eyewitness may identify the wrong person because it is dark outside, or he is without his eyeglasses, or he is under excessive stress, or he is impaired. The police may guide an eyewitness to select a favored suspect. In this opinion, we address not the unremarkable assertion that eyewitnesses may be mistaken, but the question of how to address this truism with a jury.

The Commonwealth asserts that the standard instructions addressed any weaknesses with the eyewitness' identification. Payne asserts not merely that courts may instruct juries about specific reliability issues surrounding eyewitness identifications, but that courts must do so, at least in every case where eyewitness identification is essential to the Commonwealth's case.

a. Other Jurisdictions

In 1972, the United States Court of Appeals for the District of Columbia decided United States v. Telfaire, 469 F.2d 552 (D.C. Cir. 1972). In upholding the robbery conviction at issue, the D.C. Circuit, in order "[t]o further the administration of justice in the District of Columbia," drafted and attached as an appendix a non-mandatory model jury instruction on eyewitness identification. Id. at 557. Many federal and state courts now cite Telfaire as the model for their

own instructions. The United States Supreme Court has never held that an instruction like the one proffered by Payne is constitutionally required, though it has cited Telfaire with approval.[7]

Most federal circuits have model jury instructions specifically addressing eyewitness identification testimony.[8] In most of the circuits with such model instructions, comments following the instructions advise that courts may or should give the instruction. But see Pattern Crim. Jury Instr. No. 3.12, cmt. (7th Cir. 2012) (emphasis added) ("A specific instruction on witness identification *must* be given when identification is at issue."); Model Crim. Jury Instr. No. 4.11, cmt. (9th Cir. 2010) (emphasis added) ("Since 1989, the [Ninth Circuit Jury Instructions] Committee has recommended *against* the giving of an eyewitness identification instruction because it believes that the general witness credibility instruction is sufficient.").

---

[7] Perry v. New Hampshire, 132 S. Ct. 716 (2012), mentions "[e]yewitness-specific jury instructions" like those from Telfaire as one example, among many, of ways to "warn the jury to take care in appraising identification evidence." Id. at 728-29. The Court recognized "other safeguards" built into the adversarial system that prevent juries from placing undue weight on eyewitness testimony of questionable reliability, including: (1) a defendant's Sixth Amendment right to confront the eyewitness; (2) a defendant's right to effective assistance of counsel, which in turn functions to identify flaws in the eyewitness' account through cross-examination and closing argument; and (3) the "requirement that the government prove the defendant's guilt beyond a reasonable doubt . . . [which] impedes convictions based on dubious identification evidence." Id. While Perry positively cites Telfaire-like jury instructions, also implicit in the Court's reasoning is the principle that cautionary jury instructions are not the exclusive means of attacking the reliability of eyewitness identifications.

[8] Model Crim. Jury Instr. No. 4.15 (3d Cir. 2009); Pattern Crim. Jury Instr. No. 1.29 (5th Cir. 2001); Pattern Crim. Jury Instr. No. 7.11 (6th Cir. 2014); Pattern Crim. Jury Instr. No. 3.12 (7th Cir. 2012); Model Crim. Jury Instr. for the Dist. Cts. No. 4.08 (8th Cir. 2014); Model Crim. Jury Instr. No. 4.11 (9th Cir. 2010); Crim. Pattern Jury Instr. No. 1.29 (10th Cir. 2011); Pattern Jury Instr. (Crim. Cases) Spec. Instr. No. 3 (11th Cir. 2010). In United States v. Holley, 502 F. 2d 273, 277-78 (4th Cir. 1974), the Fourth Circuit stated "As an Appendix to this opinion, we reprint the Telfaire model instruction. Prospectively, we shall view with grave concern the failure to give the substantial equivalent of such an instruction, but it is not our purpose to require that it be given verbatim."

Many of our sister states also have model jury instructions specifically addressing eyewitness identification.[9]  Of those states with such model instructions, ten (Connecticut, Hawaii, Kansas, Maryland, Massachusetts, Missouri, New Jersey, Pennsylvania, Tennessee, and Utah) require the instruction when eyewitness testimony is central to the government's case.

b.  Virginia's Approach

Virginia has no model jury instruction specifically addressing eyewitness identification, and neither this Court nor our Supreme Court has ever held that such an instruction is required.[10] The Supreme Court confronted the issue of specific identification instructions most recently in Daniels v. Commonwealth, 275 Va. 460, 465, 657 S.E.2d 84, 86 (2008).  Daniels held that the

---

[9] Rev. Ariz. Jury Instr., Crim., No. 39 (3d ed. 2014); Jud. Council of Cal., Crim. Jury Instr., Instr. No. 315 (2015 ed.); Conn. Crim. Jury Instr. 2.6-4 (2015); 1 Barbara E. Bergman, Crim. Jury Instr. for D.C., § 9.210 (rev. ed. 2014); Fla. Standard Jury Instr. in Crim. Cases, Instr. No. 3.9(c) (2013 amends.); 2 Ga. Suggested Pattern Jury Instr. (Crim. Cases) No. 1.35.10 (4th ed. 2011); Haw. Standard Crim. Jury Instr. Nos. 3.17, 3.19, and 3.19(A) (2014); Ill. Pattern Jury Instr., Crim., No. 3.15 (2014); Iowa Jury Instr. Crim. § 200.45 (2013); Pattern Instr., Kan. 4th, Crim., No. 52.20 (2013); Md. Crim. Jury Instr. & Cmt. §§ 2.56, 2.57(A) (3d ed. 2009 and supp. 2010); Mass. Crim. Model Jury Instr. No. 9.160 (2009); Mich. Model Crim. Jury Instr. 7.8 (as of June 2015); 10 Minn. Jury Instr. Guides, Crim., No. 3.19 (supp. 2006); Mo. Approved Instr.-Crim. 310.02 (as of Sept. 1, 2014); N.H. Crim. Jury Instr. No. 3.06 (1985); N.J. Crim. Model Charges, Non-2C Charges ("Identification") (2015); N.Y. Crim. Jury Instr., 2d ed. ("General Applicability—Identification") (rev. Jan., 2011); Ohio Jury Instr. Crim. 409.05 (rev. Aug. 15, 2012); Okla. Uniform Jury Instr. Crim. § 9-19 (2000 supp.); Penn. Suggested Standard Crim. Jury Instr. Nos. 4.07A, 4.07B, and 4.07C (2d ed. 2010, supp. 2015); S.C. Requests to Charge—Crim. ("Identification") (as of June 29, 2015); S.D. Pattern Jury Instr.:  Crim., Instr. 1-15-15 (rev. 1996); Tenn. Pattern Jury Instr., Crim., No. 42.05 (18th ed. 2014); Utah Model Jury Instr., CR404 (2d ed., last modified Aug. 15, 2014); Model Instr. from the Vt. Crim. Jury Instr. Comm., §§ 1-5-601 and 1-5-605 (as of Aug. 2012); Wash. Pattern Jury Instr. 6.52 (3d ed. 2014); W. Va. Crim. Jury Instr. No. 5.05 (6th ed. 2003); Wisc. Jury Instr. Crim. 141 (2012).

[10] While there is no Virginia Model Jury Instruction addressing eyewitness testimony, the Virginia Model Jury Instruction Committee includes a "Note" in the most recent edition of the Virginia Model Jury Instructions.  See Va. Model Jury Instr.—Crim., 2.800, Note on Eyewitness Identification (2014 replacement ed.).  This Note, while not an official instruction, does set forth suggested language for an eyewitness identification instruction.  The Committee prefaced such language with the following explanation:  "Given the complexity of the issue as well as the Supreme Court's view that a trial court may grant such an instruction in its discretion, the instruction below represent the committee's effort to craft such an instruction in order to assist the practitioner."  Id.

trial court did not abuse its discretion by refusing the defendant's proffered eyewitness identification instruction because the principles of law contained in the proffered instruction were fully and fairly covered by other instructions addressing witness credibility, inconsistent statements by witnesses, and the Commonwealth's burden of proof. Id. at 466, 657 S.E.2d at 87. The Supreme Court was clear that it was not going so far as to say that there was no place for eyewitness identification instructions. Id. at 465, 657 S.E.2d at 86 (stating that the court has not "opined that such an instruction would never be appropriate, nor that a court would abuse its discretion by granting such an instruction").

In Daniels, the appellant did not assert that a specific eyewitness identification instruction was always required. Id. Payne now makes that assertion.[11] We decline to adopt a rule requiring a trial court to give an eyewitness identification instruction. Our decision is consistent with the Supreme Court's holding in Daniels, with the majority approach in the Federal Circuits, and with the majority approach of our sister states.

The purpose of a jury instruction is a simple one: it conveys a principle of law to the jury. See Keen v. Commonwealth, 24 Va. App. 795, 807, 485 S.E.2d 659, 665 (1997); see also Code § 19.2-263.2 (referring to "[a] proposed jury instruction submitted by a party, which constitutes an accurate statement of the law applicable to the case"). A statement may accurately summarize long-accepted findings from the fields of psychology, biology, sociology, or history,

---

[11] Payne argues "it is now time for Virginia to adopt a uniform model jury instruction regarding eyewitness testimony" and urges that "[t]his Court . . . adopt such an instruction to prevent mistaken identifications from falsely imprisoning citizens of Virginia and to ensure that justice is achieved." In Virginia, drafting and adopting model jury instructions is not a function of the courts. Although this Court may, in the course of an opinion, comment favorably or unfavorably upon the text of a model jury instruction, we do not, as a body, author model instructions, nor do we dictate their contents to the authors. The Chief Justice of the Supreme Court of Virginia appoints the members of the Virginia Model Jury Instruction Committee. The Committee drafts the model jury instructions, and modifies them, as appropriate, in light of new case law and changes to the Code.

- 13 -

and be supported by the defendant's evidence and theory of the case; this does not mean such statement must, or even may, be given as a jury instruction. Likewise, even an eloquently-stated principle of public policy cannot become a jury instruction unless it also states an accurate principle of law. To allow jury instructions to serve any function other than conveying principles of law is to turn instructions into mechanisms for commenting upon the evidence. "An instruction which comments upon the evidence is inappropriate. Instructions that are statements of scientific knowledge, rather than of legal principle, constitute an improper comment." Charles E. Friend, The Law of Evidence in Virginia § 1-4(f)(1) (6th ed. 2003) (footnotes omitted).

> When a trial judge instructs the jury in the law, he or she may not "single out for emphasis a part of the evidence tending to establish a particular fact." The danger of such emphasis is that it gives undue prominence by the trial judge to the highlighted evidence and may mislead the jury.

Terry v. Commonwealth, 5 Va. App. 167, 170, 360 S.E.2d 880, 882 (1987) (quoting Woods v. Commonwealth, 171 Va. 543, 548, 199 S.E. 465, 467 (1938)). When a trial court rejects a jury instruction, however, it merely limits the manner by which a party may transmit information to the jury. There are many ways to educate a jury, including those, like closing argument, where commenting upon the evidence is the entire point.

Payne labels as a "flawed premise" the idea that "jurors are adequately able to detect liars from truth tellers with basic and generic instructions from the court." Virginia has long instructed jurors: "You are entitled to use your common sense in judging any testimony." Va. Model Jury Instr.—Crim., 2.500 (2014 replacement ed.). Virginia juries have served as the arbiters of witness credibility for centuries. See, e.g., Harrison v. Brock, 15 Va. 22, 36 (1810) (stating that juries "are the proper and exclusive Judges of credibility"); Lyles v. Commonwealth, 88 Va. 396, 399, 13 S.E. 802, 803 (1891) (noting that the credibility of the witness "was a matter peculiarly for the jury"). The law has not reached the point where it no

- 14 -

longer relies on juries to make credibility determinations, based on their own knowledge and experience.[12] While there is no foolproof way to determine the truth, entrustment of this function to a jury is not a flawed and antiquated premise, but the bedrock upon which the jury system rests.

We find that the instructions given by the trial court addressed any eyewitness credibility concerns. Further, such instructions addressed Payne's theory of the case (that he was misidentified as the perpetrator of the crimes). Instruction No. 1 explained the jury's role in assessing witness credibility.[13] Instruction No. 2 explained the presumption of innocence and the

---

[12] Nor can the law reach that point, barring fundamental amendments to both the United States Constitution and the Virginia Constitution. See U.S. Const. art. III, § 2 (requiring that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury"); Va. Const. art. I, § 8 (declaring that a criminal defendant "shall enjoy the right to a speedy and public trial, by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty" and "shall not be deprived of life or liberty, except by the law of the land or the judgment of his peers").

[13] Instruction No. 1:

> THE COURT INSTRUCTS THE JURY THAT you are the judges of the facts, the credibility of the witnesses, and the weight of the evidence. You may consider the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and for having observed the things about which they testified, their interest in the outcome of the case, their bias, and, if any have been shown, their prior inconsistent statements, or whether they have knowingly testified untruthfully as to any material fact in the case.
>
> You may not arbitrarily disregard believable testimony of a witness. However, after you have considered all the evidence in the case, then you may accept or discard all or part of the testimony of a witness as you think proper.
>
> You are entitled to use your common sense in judging any testimony. From these things and all the other circumstances of the case, you may determine which witnesses are more believable and weigh their testimony accordingly.

Commonwealth's burden of proving Payne's guilt beyond a reasonable doubt.[14] And Instruction

No. 4 explained that identification of the defendant was at issue and that the Commonwealth had

the burden of proving beyond a reasonable doubt that Payne was the perpetrator of the crimes.[15]

Because the jury instructions given by the trial court fully informed the jury of the law

applicable to witness credibility and Payne's theory of misidentification, Proffered Instruction 1

would have been duplicative. Parties are not entitled to redundant instructions covering

principles of law already addressed in other instructions. King, 64 Va. App. at 587, 770 S.E.2d

at 217 (citing Remington v. Commonwealth, 262 Va. 333, 349, 551 S.E.2d 620, 631 (2001)); see

also Ambrose v. Commonwealth, 129 Va. 763, 766, 106 S.E. 348, 349 (1921) ("It is not

desirable to multiply instructions and is not error to refuse even a correct instruction on a point

---

[14] Instruction No. 2:

> THE COURT INSTRUCTS THE JURY THAT the defendant is presumed to be innocent. You should not assume the defendant is guilty because he has been charged and is on trial. This presumption of innocence remains with the defendant throughout the trial and is enough to require you to find the defendant not guilty unless and until the Commonwealth proves each and every element of the crime beyond a reasonable doubt. This does not require proof beyond all possible doubt, nor is the Commonwealth required to disprove every conceivable circumstance of innocence. However, suspicion or probability of guilt is not enough for a conviction.

> There is no burden on the defendant to produce any evidence.

> A reasonable doubt is a doubt based on your sound judgment after a full and impartial consideration of all the evidence in the case.

[15] Instruction No. 4:

> The Court instructs the jury that one of the disputed issues in this case is the identification of the defendant as the person who committed the offense(s) charged in the indictment. The Commonwealth has the burden of proving this issue beyond a reasonable doubt.

upon which the jury has already been fully and correctly instructed."). Even viewing the facts in the light most favorable to Payne, the trial court did not abuse its discretion when it rejected Payne's jury instruction on eyewitness identification, because the instruction was an improper commentary on the evidence, and because other instructions fairly and fully instructed the jury.

## 2. Proffered Instruction 2

The trial court also rejected the following jury instruction proffered by Payne ("Proffered Instruction 2"), which specifically addresses "weapons focus"[16]:

> You should consider whether the witness saw the weapon during the incident. The presence of a weapon can distract the witness and take the witness's attention away from the perpetrator's face. As a result, the presence of a visible weapon may reduce the reliability of a subsequent identification if the crime is of a short duration. In considering this factor, you should take into account the duration of the crime because the longer the duration of the event, the more time the witness may have to adapt to the presence of the weapon and focus on other details[.]

The trial court rejected this instruction because it was "in the nature of argument" and not "an accurate statement of the law." We agree.

As stated above, a trial court abuses its discretion if it rejects an instruction that correctly states a principle of law applicable to the case. Proffered Instruction 2 was not an explanation of a legal principle. Payne argues on appeal that weapons focus is a "scientifically validated phenomenon," but at trial he presented no evidence explaining or supporting this phenomenon. Proffered Instruction 2 contains statements never presented to the jury about the decrease in the reliability of eyewitness identification when a weapon is involved. The instruction functions as a proxy for expert witness testimony, and an impermissible commentary on the facts of the case.

---

[16] "'Weapon focus' occurs 'when a weapon is visible during a crime' and 'can affect a witness' ability to make a reliable identification and describe what the culprit looks like if the crime is of short duration.'" Moore v. Hardee, 723 F.3d 488, 492 n.4 (4th Cir. 2013) (quoting United States v. Greene, 704 F.3d 298, 308 (4th Cir. 2013) (citation and internal quotation marks omitted)).

In Keen, this Court rejected the defendant's proffered cautionary jury instructions regarding DNA evidence. 24 Va. App. at 807, 485 S.E.2d at 665. This Court held that "[t]he instructions proposed by Keen and rejected by the trial court were statements concerning scientific knowledge, not legal principle." Id. "The substance of the proposed instructions was information which was properly imparted to the jury through the testimony of expert witnesses," and therefore, "Keen's proposed instructions would have impermissibly commented upon the evidence." Id. at 807, 485 S.E.2d at 665.

We are unaware of any precedent in this Court, the Supreme Court of Virginia, or the Supreme Court of the United States requiring a specific jury instruction about the effect of a weapon on witness perception. In Currie v. Commonwealth, 30 Va. App. 58, 515 S.E.2d 335 (1999), this Court affirmed a trial court's decision to bar expert testimony on "the perpetrator's display of a weapon and its effect on eyewitness accuracy." Id. at 63, 515 S.E.2d at 337. This Court held that "the trial court properly excluded the proffered expert testimony about the . . . effect of short viewing time, stress, and the display of a weapon" and agreed that such topics are "'within the lay knowledge of the jurors.'" Id. at 65, 515 S.E.2d at 339 (quoting the trial judge in the case).

Here, the trial judge properly denied Proffered Instruction 2. To the extent Payne wished to instruct the jury on weapons focus as a "scientifically validated phenomenon," he laid no evidentiary foundation at trial supporting or explaining the phenomenon that the instruction purported to convey. We also find the instruction to be an impermissible comment upon the evidence. Lastly, we find the distraction caused by a brandished weapon to be a circumstance within the common knowledge of the jury. Therefore, we hold that the trial court did not abuse its discretion by rejecting Proffered Instruction 2.

B.  Detective Saul's E-mail

Payne's third assignment of error alleges that "the trial court erred by refusing to introduce [sic] highly relevant and exculpatory[17] evidence."  A trial court's ruling on "admissibility of evidence . . . will not be disturbed on appeal in the absence of an abuse of discretion."  Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988).  Payne sought to introduce the entirety of the following e-mail,[18] which Detective Saul sent to an Assistant Commonwealth's Attorney on February 27, 2012:

> Actually I gave Via a photo line-up with Deante and he did pick him out.  The problem is, Deante looks like Dustin's friend "Boonie" who we initially thought was helping Dustin with the crime.  Attached is [sic] some pictures I found of Boonie.  I felt very uncomfortable getting warrants on Deante just off of a photo id since I had interviewed him on multiple occassions [sic] and he appeared to be truthful.  To date, I'm still not sure he was involved?  I have all of this documented in my case file.  Unfortunately I ran out of time before leaving and didn't put it in a supplement form.  I don't have access to mobile while in Richmond therefore I can't type a supplement.  I don't return to work until April 15th.  I told John that if he needed my case file to get Sgt. Herrick to make him a copy of it.  If you need something before I return let me know and I'll do my best to make arrangements to get it to you.  If you need a supplement, I can go in over the weekend and try to get it done.

---

[17] Payne's inclusion of this word implies that the status of evidence as exculpatory somehow enhances its admissibility, but this is not so.  Whether evidence is exculpatory and whether evidence is admissible are discrete inquiries.  That evidence is exculpatory and must be disclosed in discovery does not automatically make such evidence admissible at trial, nor does its exculpatory status make it more worthy of admission than other evidence.  See, e.g., Workman v. Commonwealth, 272 Va. 633, 647-48, 636 S.E.2d 368, 376 (2006) ("'Evidence may be material under Brady even though it is inadmissible . . . .  Because of the requirement that the outcome of the proceeding be affected, we often consider whether the suppressed, inadmissible evidence would have led to admissible evidence.'" (quoting United States v. Sipe, 388 F.3d 471, 485 (5th Cir. 2004))).  Detective Saul's doubts as to Payne's guilt and her feeling that he was truthful must be disclosed, as they might lead to admissible evidence, and could be useful on cross-examination.  But the entire e-mail does not become admissible simply because it might help Payne.

[18] The e-mail refers to Payne as "Deante," to Payne's cousin as "Dustin," and to the victim as "Via."

The trial court redacted all but the first three sentences of the e-mail. The trial court reasoned that those three sentences were relevant to the manner in which Detective Saul's investigation progressed, but ruled that the remainder of the e-mail was irrelevant because Detective Saul's "feelings on whether or not the defendant is credible, whether he did it, whether he didn't do it, is not germane to this case." Specifically, "[h]er feelings about whether or not [Payne] did it or didn't do it, while it may have impacted the manner in which she conducted her investigation, it has nothing to do with the issue that's before this trier—this jury." We agree with both the ruling and the logic of the trial court, and hold that the trial court did not abuse its discretion when it refused to admit the entire e-mail.

Evidence must be relevant to be admissible. It is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. The redacted portion of the e-mail contained Detective Saul's opinion, which is irrelevant. The trial court could not admit Detective Saul's opinion that Payne was truthful and innocent, any more than it could have admitted a contrary opinion (that Payne was dishonest and guilty). Such conclusions are not facts at all.

Admitting Detective Saul's opinion would have invaded the province of the jury. In Pritchett v. Commonwealth, 263 Va. 182, 557 S.E.2d 205 (2002), the defendant wished to present expert testimony on the lack of truthfulness of his own confession. The Supreme Court of Virginia stated that "[a]n expert witness may not express an opinion as to the veracity of a witness because such testimony improperly invades the province of the jury to determine the reliability of a witness." Id. at 187, 557 S.E.2d at 208; see also Mullis v. Commonwealth, 3 Va. App. 564, 571, 351 S.E.2d 919, 923 (1987) ("For a juror to give unqualified credence to the testimony of a law enforcement officer and to decide credibility issues solely on that basis is an impermissible basis for resolving credibility and would constitute bias.").

- 20 -

Additionally, in Virginia, even expert witnesses (which Detective Saul would be if her e-mail were received for the truth of her opinion as to Payne's truthfulness and lack of involvement in the crime) may not testify as to the ultimate issue at stake in a trial.[19]  Here, if Payne was uninvolved in the crime, it would mean he was not guilty.  Detective Saul's e-mail was properly barred as an improper expression of opinion as to an ultimate issue.  See Zelenak v. Commonwealth, 25 Va. App. 295, 300, 487 S.E.2d 873, 875 (1997) (refusing to permit expert testimony that defendant had a "disorder that made her 'susceptible to duress'" because such "testimony expresses an opinion on the precise and ultimate issue in this case").

Although the redacted opinions were inadmissible, any facts that caused Detective Saul to doubt Payne's guilt or that objectively supported a conclusion as to Payne's honesty would be admissible.  Detective Saul would be free to testify, for example, "There is another man that looks very much like Payne, and we have never been able to rule him out as a suspect."  The jury would then be free to weigh this fact in assessing whether it had reasonable doubt.  But it is a jury's job to determine whether reasonable doubt exists.  A jury cannot rely on the proxy judgment of a witness.  Similarly, as to Payne's truthfulness, Detective Saul would be free to testify, for example, "Payne looked me in the eye the entire time we were talking, he was not sweating, his voice was not shaking, and I verified that he was across town when the crime occurred."  The jury would be free to infer that Payne was telling the truth.  What is impermissible is for a witness to testify to the follow-up conclusion:  "Therefore I believed him."

---

[19] Notwithstanding the trial court's refusal to admit the entire e-mail, on cross-examination of Detective Saul, Payne was able to elicit the sentiment of the redacted portions of the e-mail ("And at the time that you wrote this e-mail, you did not think Deante was involved in this crime, right?"  "No.").  As part of his closing argument, Payne's attorney also said this:  "If you share the same doubts that a ten-year veteran on the force found, you have to find my client not guilty."  Both the cross-examination question and the argument in closing were objectionable for the same reason the unredacted e-mail was, but the Commonwealth made no objection.  In this way, Payne was able to use Detective Saul's e-mail much more expansively than the redaction should have permitted.

## C. Expert Witness Funds

Payne's fourth assignment of error alleges that "the trial court erred by refusing to provide the indigent defendant with the necessary funds to hire an expert for his defense." "Whether a defendant has made the required showing of particularized need [for the authorization of state funds to hire an expert witness] is a determination that lies within the sound discretion of the trial court." Commonwealth v. Sanchez, 268 Va. 161, 165, 597 S.E.2d 197, 199 (2004). Payne sought an expert witness on "eye-witness misidentification, weapons focus, and cross-racial misidentification" to provide "generalized education of the jury members regarding factors that affect eyewitness identifications and how—and how those factors are present in this case . . . ."[20] Payne anticipated that the total cost of the expert, including travel to and from California, would be approximately $8,000. The trial court denied Payne's request for funds to hire an expert, stating that it was "not satisfied that the defendant has adduced a particularized need which would be addressed by the expert testimony he proposes to adduce" and further stating that it was:

> not satisfied that, one, such evidence is not invasive of the jury function, and, two, such evidence is necessary, given the ability on cross-examination to test before the trier of fact the basis upon which an identification is made, duration of contact, opportunity to observe, all those types of issues.

We agree.

---

[20] In support of his argument that the trial court erred by not funding his expert, Payne states that the concept of cross-racial identification is not widely understood, and argues: "This is especially true in the instant matter where the jury was composed of all white men and women. The jury, by its own demographics, did not have the ability to evaluate the impact of a cross-racial identification." We decline to consider this portion of Payne's argument for two reasons. First, to the extent the argument implies that the racial make-up of the jury rendered their verdict constitutionally infirm, Payne made no objection at trial following jury selection, when given the explicit opportunity to object. See Rule 5A:18 (requiring that that any objection be "stated with reasonable certainty at the time of the ruling" in order to preserve an issue for appellate review). Second, there is no indication in the record of the racial make-up of the jury.

The Due Process Clause of the United States Constitution requires the Commonwealth to provide criminal defendants with "'the basic tools of an adequate defense,'" which "may include the appointment of non-psychiatric experts." Husske v. Commonwealth, 252 Va. 203, 211, 476 S.E.2d 920, 925 (1996) (quoting Ake v. Oklahoma, 470 U.S. 68, 77 (1985)). A defendant must demonstrate a "particularized showing of the need for the assistance of such experts." Id. The right is not absolute, and "does not confer a right upon an indigent defendant to receive, at the Commonwealth's expense, all assistance that a non-indigent defendant may purchase." Id.

An indigent defendant who seeks government funds to hire an expert witness must demonstrate that: (1) "the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,'" and (2) "he will be prejudiced by the lack of expert assistance." Id. at 212, 476 S.E.2d at 925 (quoting Ake, 470 U.S. at 82-83). "[A]n indigent defendant satisfies this test by showing that 'the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial.'" Dowdy v. Commonwealth, 278 Va. 577, 592-93, 686 S.E.2d 710, 718-19 (2009) (quoting Husske, 252 Va. at 212, 476 S.E.2d at 925).

Payne satisfied the first prong of the two-part test enunciated in Husske by showing that the testimony of the eyewitness and the weight to be afforded such testimony was "'likely to be a significant factor in his defense.'" Husske, 252 Va. at 212, 476 S.E.2d at 925 (quoting Ake, 470 U.S. at 82-83). However, Payne failed to satisfy the second prong because he did not demonstrate that he would be prejudiced by the lack of expert assistance. Furthermore, we find that the proffered expert testimony would not have been admissible at trial in any event.

The trial court did not rule that the expert testimony summarized by Payne would be inadmissible, since that question was not before the court. Rather, the trial court ruled on the motion for funds to hire such an expert. Though Payne assigns error only to the trial court's

denial of funds to hire an expert, the hypothetical admissibility (or inadmissibility) of the desired

expert's testimony is relevant in determining whether the trial court abused its discretion in

refusing to fund such an expert.

Although Payne claims that the expert he sought to hire was not intended to opine as to

the victim's credibility,[21] in essence Payne wanted an expert to testify to the infirmities of a

specific witness' testimony.  In Coppola v. Commonwealth, 220 Va. 243, 257 S.E.2d 797 (1979),

the Supreme Court addressed the issue of expert testimony concerning witness credibility:

> It is well settled in Virginia that the credibility of witnesses and the
> weight to be given their testimony are questions exclusively for the
> jury.  In any proper case, an expert witness may express his
> opinion upon matters not within the common knowledge or
> experience of the jury.  However, expert testimony concerning
> matters of common knowledge or matters as to which the jury are
> as competent to form an opinion as the witness is inadmissible.
> Where the facts and circumstances shown in evidence are such that
> men of ordinary intelligence are capable of comprehending them,
> forming an intelligent opinion about them, and drawing their own
> conclusions therefrom, the opinion of an expert based upon such
> facts and circumstances is inadmissible.

Id. at 252, 257 S.E.2d at 803-04 (internal citations omitted).[22]  Here, because the subject of

testimony sought from the expert was within the common knowledge and experience of the

jurors, such testimony would have been inadmissible, and its absence could not result in a

fundamentally unfair trial.  See Currie, 30 Va. App. at 64, 515 S.E.2d at 338 (stating that the

---

[21] Payne's attorney stated at the motion hearing "He [the desired expert] can't say oh—he can't attack Mr. Via's credibility."

[22] Since deciding Coppola, this Court has decided Currie, in which this Court acknowledged "that in some 'narrow' circumstances, expert testimony may be useful to the jury, including in the following areas: 'such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference." Currie, 30 Va. App. at 64-65, 515 S.E.2d at 338 (quoting Rodriguez, 20 Va. App. at 127, 455 S.E.2d at 727).  Recognizing that there could be circumstances where eyewitness expert testimony would be appropriate does not mean that denial of funding for such expert testimony automatically renders a trial fundamentally unfair.  A trial court retains the discretion to permit or forbid such testimony.

"trustworthiness of eyewitness observations is not generally beyond the common knowledge and experience of the average juror").

Furthermore, as the trial court noted, defendants can challenge the reliability of eyewitness testimony in many ways during trial. See id. (explaining that "the weaknesses of [eyewitness] identifications can be explored on cross-examination and during counsel's final arguments to the jury"); Rodriguez v. Commonwealth, 20 Va. App. 122, 128-29, 455 S.E.2d 724, 727-28 (1995) (affirming a trial court's decision disallowing expert testimony on eyewitness identifications); supra note 5 (discussing Perry). Payne took advantage of the opportunity to cross-examine the victim, and he questioned the victim extensively on various topics bearing on his ability to see his assailant, his lack of prior familiarity with his assailant, the stress of the situation, the lighting, and the duration of the encounter. Payne also made these points in his closing argument to the jury.

The subject of the testimony sought from the expert was within the common knowledge and experience of the jury. As such, the testimony of the expert Payne wished to retain would have been inadmissible. Additionally, Payne failed to demonstrate a particularized need for the expert, and failed to demonstrate that the denial of an expert's services would result in a fundamentally unfair trial. For these reasons, the trial court did not abuse its discretion when it denied his motion for funds to hire an expert.

### III. CONCLUSION

The trial court did not abuse its discretion when it (1) refused Payne's proffered jury instruction regarding eyewitness identification testimony, (2) refused Payne's proffered jury instruction regarding "weapons focus," (3) excluded the redacted portion of Detective Saul's

e-mail, and (4) denied Payne's requests for funds to hire an eyewitness identification expert witness.

Affirmed.